Elizabeth Peake died March 26th, 1931, intestate. Shortly thereafter letters of administration on her estate were granted to William Patrick Barry on his petition representing himself as her brother and only next of kin. Thereafter a petition was presented to the orphans court by Emma Reilly, Kathryn Newman, Henry Grater and William Grater, stating that they were nephews and nieces of Elizabeth Peake and her next of kin with William Patrick Barry and praying an order declaring their relationship to said deceased. Upon the argument before the orphans court, it was stipulated on behalf of Barry and the petitioners, that Elizabeth Peake, Catherine Grater (mother of said petitioners) and Barry were children of the same father, but not of the same mother and on December 1st, 1931, an order was entered in the orphans court that said petitioners were entitled to share equally, as nephews and nieces, in a half interest in the personal estate of Elizabeth Peake, as children of Catherine Grater, a half-sister of Elizabeth Peake. This appeal is from that order, the grounds being that said stipulation was improvidently made because Catherine Grater was not a sister of Elizabeth Peake and also *Page 234 
because, even if she was a sister of the half-blood, William P. Barry, as a brother of the whole blood is, under the statute of distributions, entitled to the entire personal estate of the deceased, to the exclusion of the children of Catherine Grater. Testimony was taken de novo before me and upon that testimony the first ground of appeal must be decided.
Mary Barry, the mother of Elizabeth Peake and William P. Barry, was born in Ireland in or about the year 1809 and came to this country as Mary Benaw (or Benen, or Bannon), a widow, in or prior to the year 1843, bringing with her a child known as Catherine Benaw, then about seven years old, and they resided together until Catherine married Henry Grater (or Greater, or Cretor), May 12th, 1853. Catherine was the mother of the respondents in this appeal and she died March 27th, 1874. Mary Benaw married Simon Barry in or about 1843 and Elizabeth Peake and William P. Barry were children of the second marriage.
The evidence to establish that Catherine Grater was the daughter of Mary Barry is meager because of the lack of family or other records, but there is sufficient to lead me to the conclusion that Elizabeth Peake, William P. Barry and Catherine Grater were children of Mary Barry. First, there is the fact that when Mary (Benaw) Barry came to this country as a widow, she brought Catherine with her and Catherine was known by Mrs. Barry's then surname of Benaw and lived with her as a member of her family until Catherine's marriage. There is a strong inference that at the time Mary (Benaw) Barry came here from Ireland she would not have brought a young child with her unless that child was related to her. The appellant says there is no evidence that Mary (Benaw) Barry had married one Benaw in Ireland and that is true, except that there is satisfactory circumstantial evidence to that effect. If Catherine was her daughter, the presumption is that she was the issue of a lawful marriage. It appears from the testimony of William P. Barry that his father, Simon Barry, came from Ireland on the same boat with Mary Benaw and that after the marriage of Mary and Simon, Catherine lived with them several years. Again, if *Page 235 
Catherine was Mary's daughter, there is a strong inference that before Simon married Mary, she satisfied him that Catherine was her lawful issue and that she (Mary) was a widow.
Next there is the fact that when Catherine married Henry Grater, she gave her mother's name as Maria Barry (Mary Barry then being the wife of Simon Barry) and her father's name as John Benaw (or Benan) and she must have known her father and his name before she left Ireland, or have been told his name by Mary Barry. There is the further fact that for the first twenty years of his life, William P. Barry believed Catherine to be his sister; that they were brought up as brother and sister and that she was always known among their friends as his sister. There is the further fact that Catherine Grater's children, from the time of their birth in their association with Elizabeth Peake, called her "aunt." There is the further and most convincing fact, that when Catherine died Mary Barry had predeceased her by about two weeks; that William P. Barry caused both to be buried in his cemetery plot and he, or Elizabeth Peake with his knowledge and consent, caused to be inscribed on a tombstone on that plot the following: "Mary Barry — died April 15th, 1874, aged 65 years. Also her daughter, Catherine Grater — died March 27th, 1874, aged 38 years." There is also some testimony that Elizabeth Peake stated that Catherine Grater was her sister.
The only testimony that Catherine Grater was not a daughter of Mary Barry was given by William P. Barry. He was over eighty-seven years old when he testified, sick and infirm and his memory was decidedly faulty. Although for the first twenty years of his life he had believed Catherine to be his sister (undoubtedly because his mother had told him so), he testified that his mother informed him sometime between 1865 and 1874 (he could not fix the time more definitely) that Catherine was not her child. Yet when Catherine died he arranged for or consented to the tombstone inscription which states that Catherine was his mother's daughter. It should be noted that in 1931 his proctor had stipulated in the court below that Catherine was his sister (having the same father), which stipulation must have been based on *Page 236 
Barry's belief, communicated to his proctor. It should also be noted that earlier in his testimony Barry was asked how he knew that Catherine was not his mother's child and he said he knew nothing about it; that his mother never told him anything about it.
My conclusion being that Catherine Grater was a half-sister of Elizabeth Peake, brings me to the second ground of appeal.
The deceased left her surviving no husband, child or representative of a child and both parents were dead. The statute then in force applicable to distribution of her personal estate is P.L. 1930 ch. 130, being an amendment to section 169 of the Orphans Court act. Comp. Stat. p. 3874. It reads as follows:
"169 B. If there be no husband or widow, as the case may be, then all of the said estate to be distributed equally to and among the children; and in case there be no child, nor any legal representative of any child, then equally among the parents and brothers and sisters and the representatives of deceased brothers and sisters" * * *.
The appellant contends that in the situation here present, the statute provides for distribution among brothers and sisters of the whole blood to the exclusion of a sister of the half-blood and that William P. Barry, as brother of the whole blood, should take the deceased's entire personal estate. The appellant seeks to read into the statute the words "of the whole blood," after the words "brothers and sisters." In a case involving the construction of a subsection of said section 169, our court of errors and appeals disapproved reading words into a statute that were not there and held that the right to inherit, being the gift of the legislature and not a natural right, the law of distribution of personal property is as the legislature makes it and not as we think it should be. In re White, 87 N.J. Eq. 607.
Our legislature made frequent changes in the statute in question before and since the revision of 1877 (among them P.L.1898 p. 778; P.L. 1899 p. 203; P.L. 1908 p. 643; P.L. 1914 p. 69;P.L. 1918 p. 179; P.L. 1930 p. 394), but it has never seen fit to discriminate between brothers *Page 237 
and sisters of the whole blood and those of the half-blood, in spite of decisions of our courts to which I shall hereafter refer, stating that their rights were equal and also despite the fact that the revision of 1877 (Comp. Stat. p. 1918), to go back to no earlier legislation, dealing in several sections with the descent of real estate of persons dying intestate, specifically distinguishes between brothers and sisters of the whole blood and those of the half-blood. These sections also have been variously amended (Cum. Supp. Comp. Stat. p. 939) but always the legislature has continued the difference in right to inherit as between the whole and half blood. An instance of the same legislature providing that the whole blood should inherit real estate in preference to the half-blood, while making no such distinction in the distribution of personal property, is seen by comparing P.L. 1918 p. 179 with P.L. 1918 p. 1012. Various legislatures having considered the rights of the whole blood as against the half-blood and having made no discrimination between them in the distribution of personal property, I find no justification for interpolating in the statute under consideration, words that the legislature omitted.
Our early distribution statutes passed in 1795 closely followed the English law (Davis v. Vandeveer's Adm'r, 23 N.J. Eq. 558;Wagner v. Sharp, 33 N.J. Eq. 520) and under the English law there was no distinction between brothers and sisters of the whole blood and those of the half-blood. In 1690 the English high court of chancery, in Crooke v. Watt, 2 Vern. 123, a case which turned on the single point whether a sister of the half-blood should share in personal property with a brother and sister of the whole blood, said that the half-blood should have an equal share with the whole blood and that to give a different rule to it would make great confusion and disturbance. A footnote to this report states that the decree was affirmed on appeal to the house of lords. In 1823, the same court in Jessop v.Watson, 1 Myl. K. 665, held in favor of children of the half-blood under a statute quite similar to the one here under consideration.
The first reported case in this state is Smith v. McDonald *Page 238 
(1906), 71 N.J. Eq. 261, in the court of errors and appeals, involving construction of a subsection of said section 169. The learned justice who wrote the opinion observed that the half-blood share in personal estate with the whole blood and although no distributee of the half-blood was concerned in the case, the dictum has been cited in subsequent cases as the law of this state and considering the great ability of the learned justice and that there was but one dissenting vote on his opinion, I take it that the court of errors and appeals had in mind the decisions of the English courts on statutes similar to ours.
In Albright v. Van Voorhis (1908), 104 Atl. Rep. 27, involving a question of the proper distribution of personal property in which an interest was claimed through a sister of the half-blood, Vice-Chancellor Stevens held that a sister of the half-blood took equally with a sister of the whole blood.
In re Tantum (1924), 97 N.J. Eq. 271, involved the right of certain next of kin of the half-blood to share in personalty and Vice-Ordinary Foster said it was conceded that those of the half blood were entitled to share equally with those of the whole blood and he so held.
In re Bell (1926), 99 N.J. Eq. 835, involved a question of distribution under said section 169, in which no distributee of the half-blood was concerned, but Vice-Ordinary Lewis said that in the distribution of personal property, the half-blood participates equally with the whole blood. His opinion was affirmed in 100 N.J. Eq. 567.
In view of the decisions of the English courts and the opinions of the learned judges of our own courts, whether the latter bedicta or directly upon the question now under consideration, and after reading our statute, I can have no doubt that had Catherine Grater survived Elizabeth Peake, she would share equally with William P. Barry in the Peake personal property, but she predeceased her half-sister, leaving children. Such of those children as survived Elizabeth Peake are entitled under P.L.1930 ch. 130, to have per stirpes, their mother's share.Fisk v. Fisk, 60 N.J. Eq. 195; In re Tantum, supra; In reMiller, 103 N.J. Eq. 86.
The decree of the orphans court will be affirmed. *Page 239